**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| LINH TRAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>XBIOTECH INC., JOHN SIMARD, AND QUEENA HAN,<br><br>Defendants. | **Civil Action No.: A-15-CA-01083-SS**<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiff Kresimir Corak ("Lead Plaintiff" or "Plaintiff"), by and through his counsel, individually and on behalf of all others similarly situated, for this Consolidated Class Action Complaint against defendants XBiotech Inc. ("XBiotech" or the "Company"), John Simard ("Defendant Simard"), and Queena Han ("Defendant Han," and together with the Company and Defendant Simard, "Defendants"), alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his counsel, including, among other things, conversations with witnesses; a review of the Defendants' public documents, conference calls and public announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases; analysts' reports and advisories about the Company; and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased XBiotech common stock between April 15, 2015 and November 23, 2015 (the "Class Period"), inclusive, seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. XBiotech is a clinical-stage biopharmaceutical company engaged in the discovery and development of "True Human" antibodies intended for the treatment of a variety of diseases. True Human antibodies, according to the Company, "are those which occur naturally in human beings" and "have the potential to be safer and more effective than their non-naturally occurring counterparts." The Company's lead product candidate is known as "Xilonix," to which the Company devotes the majority of its resources and efforts. Xilonix is intended to treat patients with advanced colorectal cancer, especially those who have reduced tolerance for toxic therapy.

3. The Company has obtained the "Fast Track" designation from the U.S. Food and Drug Administration in connection with its currently ongoing Phase III trial for Xilonix's treatment of symptomatic colorectal cancer in Europe (the "Phase III Trial").[1] The Company began the Phase III Trial in July 2014, seeking to recruit at least 276 patients from approximately 40 clinical trials sites in European nations such as the United Kingdom, France, Germany, Poland, and Belgium.

4. Although the Company's Chief Executive Officer, Defendant Simard, did not have adequate prior experience overseeing a global clinical trial of such magnitude, such lack of experience did not prevent him from imposing his will upon the administration of the Phase III

---

[1] While the Company also is conducting a Phase III trial in the United States for advanced refractory colorectal cancer, only the European Phase III study for symptomatic colorectal cancer is discussed herein.

Trial. Defendant Simard's dangerous combination of inexperience alongside his heavy-handed management style manifested itself in, among other things: (a) his failure to exercise effective oversight of the contract research organizations ("CROs") responsible for administering the Phase III Trial at the various clinical sites in Europe; and (b) his overruling of more experienced in-house advisors in formulating the Company's Phase III Trial timeline.

5. Due to complexities inherent in managing clinical trials of the size and scope of the Phase III Trial, even the largest biopharmaceutical companies typically enter into agreements with CROs to manage the conduct of trials on the ground, which allow sponsors to benefit from the CROs' specialized expertise, data management capabilities, and ability to speed the process of bringing a product candidate to market. Engagement of a CRO, however, does not divest the sponsor of its ultimate regulatory responsibility for oversight of the CRO's administration of the clinical trial. In an effort to cut costs and maintain control, Defendant Simard engaged a small, Warsaw, Poland-based site management organization ("SMO"),[2] which had limited experience and capabilities, to administer the Phase III Trial. Although this decision, when compared to the selection of a larger, more established CRO, may have afforded Defendant Simard a greater opportunity to micromanage the administration of the Phase III Trial, it also carried certain material risks as to its execution, which were amplified by Defendant Simard's inexperience in overseeing global clinical trials of this size and scope.

6. During the Class Period, therefore, Defendants knew or recklessly disregarded the potential impact that their CRO selection could have upon the administration of the Phase III Trial.

---

[2] Generally, an SMO may be distinguished from a CRO based on the scope of responsibilities entrusted to the organization. Whereas SMOs generally are limited to managing a specific trial site(s), involving tasks such as patient recruitment and administration of the testing protocol, CROs are entrusted with a comparatively greater scope of responsibility for protocol design, data management, monitoring of the investigation and/or statistical analysis.

In selecting a small, relatively inexperienced company based in Poland, which by its own admission was not viewed within the industry as a "top tier" CRO, the Company went against conventional wisdom holding that the selection of a large CRO is a safe choice for execution. Having disclosed that the Company relies on CROs for the conduct of clinical trials, Defendants were duty bound, but failed, to disclose the material risk that their chosen CRO might fail to execute the Phase III Trial properly.

7. After commencing the Phase III Trial in July 2014, the Company needed more capital to fund its development of Xilonix. Accordingly, the Company prepared for its initial public offering ("IPO") by filing a Registration Statement on February 2, 2015, which was subsequently amended three times before being declared effective by the SEC on April 15, 2015, and its Prospectus on April 16, 2015. In the Registration Statement and Prospectus, the Company stated that it expected to enroll "at least 276 patients" in the Phase III Trial and complete the study by "mid-2015," even though the Company was able to enroll only 122 patients between the commencement of the Phase III Trial in July 2014 and March 3, 2015. Defendant Simard dictated this timeline despite being advised by his more seasoned, senior colleagues that the stated deadlines for enrollment and completion could not be met without substantially increasing the number of clinical sites. Since a substantial increase in the number of clinical sites would result in a concomitant increase in the Company's costs, however, Defendant Simard did not consider such a course of action viable in light of the substantial amounts of cash required to fund Xilonix's development in the two ongoing, costly Phase III trials.

8. During the Class Period, therefore, Defendants knew or recklessly disregarded ongoing problems experienced by their CRO in enrolling patients for the Phase III Trial since July 2014. Although they claimed that the Company "will enroll at least 276 patients" in the Phase III

Trial that was "expected to be completed by mid-2015," Defendants knew of, or recklessly disregarded, enrollment statistics supporting the inescapable conclusion that the stated deadlines were unrealistic, if not virtually impossible to meet, given the limited time remaining and number of trial sites.

9. On November 23, 2015, the Company issued a press release announcing that the undisclosed risks described above had materialized. Specifically, the Company revealed that various irregularities in the administration of the Phase III Trial had compromised data for 72 patients. The Company also disclosed that oversampling had not been performed to accommodate such data loss, and that the results of the Phase III Trial will have reduced statistical power to demonstrate the proposed effect. On this news, shares of XBiotech declined $4.50 per share, or approximately 34%, to close at $8.75 per share on November 24, 2015, on unusually heavy volume.

10. In a report issued on November 24, 2015, an analyst for Noble Financial advised investors that the "mismanagement" of the Phase III Trial was "likely due to poor execution by CRO."

11. The data loss disclosed on November 23 and drop in stock price was the direct result of Simard's failure to meet promised patient enrollment goals and irresponsible micromanagement of the trial. Due to Simard's undisclosed mismanagement, patient testing was compromised and data was lost. As a result of Defendants' wrongful acts and omissions, and the consequent precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). XBiotech's principal executive offices are located within this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place in this Judicial District.

15. In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased XBiotech securities at artificially inflated prices during the Class Period, and has been damaged thereby.

17. Defendant XBiotech is incorporated in Canada and headquartered at 8201 E. Riverside Drive, Bldg. 4, Suite 100, Austin, Texas 78744. Defendant is a clinical-stage biopharmaceutical company, which engages in the discovery and development of True Human monoclonal antibodies for treating various diseases. XBiotech's lead product is Xilonix, a novel anti-cancer agent. XBiotech's shares trade on NASDAQ under the ticker "XBIT."

18. Defendant John Simard ("Simard") is the Company's Chief Executive Officer ("CEO"), President, and Chairman. Defendant Simard signed the IPO Registration Statement.

19. Defendant Quenna Han ("Han") is the Company's Vice President of Finance and Human Resources as well as the Principal Financial Officer and Principal Accounting Officer. Defendant Han signed the IPO Registration Statement.

20. Defendants Simard and Han are collectively referred to herein as the "Individual Defendants."

21. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

22. XBiotech is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

23. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to XBiotech under *respondeat superior* and agency principles.

24. Defendant XBiotech and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### *Background*

25. XBiotech is a pharmaceutical company attempting to discover and develop antibody therapies, known as True Human antibodies, which are derived from natural immunity to disease. True Human antibodies, according to the Company, "are those which occur naturally in human beings" and "have the potential to be safer and more effective than their non-naturally occurring counterparts."[3]

26. XBiotech's lead product is Xilonix, which is currently the subject of two pivotal clinical studies regarding the treatment of patients with colorectal cancer. According to the Company itself, "[t]he majority of our efforts to date have been concentrated on developing [Xilonix]."[4]

### *The Phase III Trial*

27. One of the Company's two pivotal studies is the Phase III Trial currently underway in Europe, which is aimed at evaluating Xilonix's treatment of patients with symptomatic

---

[3] Registration Statement at 1; Prospectus at 1.
[4] Registration Statement at 1; Prospectus at 1.

colorectal cancer. "If these trials are successful," the Company's stated intention is to "seek marketing approvals for [Xilonix] in Europe and/or in the United States," and then "distribute and sell this product through our own direct sales force or with a commercial partner."[5]

28. The Phase III Trial began in July 2014, with a stated recruitment goal of at least 276 patients from approximately 40 clinical trial sites across Europe, including sites located in the United Kingdom, France, Germany, Poland, and Belgium. The study's primary objective is to evaluate the efficacy of Xilonix in reversing the symptoms of patients with advanced colorectal cancer, including muscle loss, fatigue, appetite loss, and pain. The Company intends to measure the efficacy of Xilonix by assessing the change in these symptoms for patients treated with Xilonix as compared to those who were treated with the placebo.

***The Company's CEO, Defendant Simard***

29. According to a former employee ("FE1"),[6] XBiotech's CEO, Defendant Simard, did not have any experience with oversight of a large, global clinical trial like the Phase III Trial. Based on his interactions with Defendant Simard during weekly meetings which were held throughout the term of his employment at the Company and at which the Phase III Trial was discussed, FE1 stated that Defendant Simard "doesn't know anything about the management of clinical trials."

---

[5] Registration Statement at 1; Prospectus at 1.

[6] FE1 was Vice President of Clinical Operations at XBiotech from June 2014 to February 2015. In that role, FE1 was responsible for overseeing the clinical trials for Xilonix and was one of XBiotech's two liaisons for the CRO about the Phase III Trial's progress. FE1 reported directly to Defendant Simard and was one of two XBiotech employees who briefed Defendant Simard on weekly developments in the Phase III Trial. FE1 has worked in the biopharmaceutical industry for more than 20 years. Prior to being employed at XBiotech, FE1 was, among other things, a Senior Director of Clinical Development at INC Research and an Associate Director of Clinical Research at Genzyme Corporation.

30. Notwithstanding Defendant Simard's lack of experience with oversight of large, global clinical trials, the Company relied heavily on him in all, or nearly all, aspects of its business. In the Registration Statement and Prospectus, the Company stated as follows: "Our future success depends in significant part on the continued service of our Chief Executive Officer, John Simard. Mr. Simard is critical to the strategic direction and overall management of our Company as well as our research and development process. Although we have an employment agreement with Mr. Simard, it has no specific duration. The loss of Mr. Simard could adversely affect our business, financial condition and operating results."[7]

31. Nor did Defendant Simard's lack of experience in overseeing large, global clinical trials prevent him from micromanaging all, or nearly all, of the Company's initiatives. According to FE1, the Phase III Trial was no exception. FE1 recalls that Defendant Simard insisted on controlling virtually every aspect of the Xilonix trials. Defendant Simard "has 100 percent to do with everything [at XBiotech]," according to FE1, and "he overreaches [given] his expertise." Upon reflection, FE1 stated that he "never [before] had [experienced] the level of involvement of the CEO," and that Defendant Simard's management style led some "very seasoned" XBiotech employees to leave of their own accord "because of the environment." FE1 observed that Defendant Simard generally did not trust the judgment of his colleagues and instead preferred to make most decisions himself.

32. Defendant Simard's combination of inexperience alongside his heavy-handed management style presaged not only the Company's choice of a CRO to administer the Phase III Trial, but the execution problems that compromised the trial data as well.

---

[7] Registration Statement at 21; Prospectus at 21.

***Selecting and Retaining a CRO***

33. Due to the complexities inherent in managing clinical trials of the size and scope of the Phase III Trial, it is common for even the largest biopharmaceutical companies to enter into agreements with CROs to manage the conduct of trials on the ground. Retention of a CRO allows a sponsor to benefit from the CRO's specialized expertise, data management capabilities, and ability to speed the process of bringing a product candidate to market.

34. Generally, the sponsor and the CRO negotiate the terms of the CRO's scope of authority for the trial, according to FE1, and the CRO's responsibilities may vary considerably based on the capabilities of the CRO. Ultimately, however, the sponsor is responsible for ensuring that the CRO fulfills the duties which it has been allocated under the terms of the parties' agreement. Typically, though, the CRO bears responsibility for ensuring that patients receive the correct dosage, according to another former XBiotech employee ("FE2"),[8] whereas the sponsor usually assumes responsibility for monitoring general trends in patient enrollment and "put[ting] processes in place to get feedback from the investigators about mitigating [the attrition]," according to FE1.

35. The selection of a CRO often calls into account the priorities of the sponsor for the study, since not all CROs are created equal. CROs may distinguish themselves from one another in terms of capabilities, size, pricing, and reputation, among other things.

36. CROs may be distinguished from site management organizations ("SMOs") based upon the scope of their responsibility and work in connection with a clinical trial. Whereas CROs

[8] FE2 was Director of Clinical Operations at XBiotech from June 2012 to March 2016. In that role, FE2 was responsible for oversight of the Phase III Trial, and acted as a point of contact for the CRO. Among other things, FE2 budgeted for clinical sites, managed internal operations, informed the CRO employees of their tasks and timeline, and ensured that the CRO was monitoring the clinical sites adequately. FE2 reported to Defendant Simard and FE1.

generally are entrusted with responsibility (in varying degrees) for protocol design, data management, monitoring of the investigation and/or statistical analysis, SMOs are limited to management of a specific trial site(s), performing tasks such as patient recruitment and administration of the testing protocols. The services provided by CROs tend to be much more expensive when compared to those provided by SMOs.

37. The relative size of the CRO tends to have significant implications for sponsors when choosing which CRO to engage for a clinical trial. To quote Zachary Brennan of *outsourcing-pharma.com*, "[t]he perception that larger CROs guarantee a higher level of safety seems to permeate" the industry.[9] In an October 21, 2014 article published online, Brennan interviewed Mike Jagielski, the CEO of KCR, which in fact was the CRO selected by XBiotech to administer the Phase III Trial. Jagielski painted the following contrast between larger and smaller CROs: "Size can be an advantage depending on perspective. You are a large CRO that suggests security, therefore making a safe decision for execution. I would say this is certainly the case if a large pharma company would like to outsource the development of entire programs."[10] On the other hand, smaller CROs, according to Jagielski, "have the advantage of flexibility and rapid decision making. Execution standard can be easier adjusted to the client needs, innovations can be adapted faster – it is simply a matter of scale."[11]

38. In other words, a smaller CRO typically places the sponsor closer to the investigators who are actually on the ground at the trial sites, which tends to allow for the creation of a more flexible and customized arrangement to suit the sponsor's preferences. By contrast, a

---

[9] *See http://www.outsourcing-pharma.com/Clinical-Development/Do-mid-size-CROs-have-business-model-problems-One-CEO-thinks-so.*
[10] *See id.*
[11] *See id.*

larger CRO typically places additional layers of personnel at the investigation sites, which minimizes flexibility due to coordination issues but provides added security in the form of increased scrutiny and quality control during the course of the investigation. The involvement of more personnel, of course, typically carries with it a larger price tag for the services performed by larger CROs.

39. A CRO's reputation within the industry also seems to have at least a rough correlation with its size. According to an August 18, 2014 article written by Zachary Brennan of *outsourcing-pharma.com*,[12] a review of the clinical trials database at *clinicaltrials.gov* reveals that, of the trials run by the "top" CROs, "the largest CROs are scooping up the most trials as collaborators," with "the big players … leaving little room for smaller firms to compete."[13]

***XBiotech's Selection of KCR as its CRO***

40. FE1 and FE2 confirm that the Company selected KCR, an entity formerly known as "Kiecana Clinical Research," as its CRO in advance of the Company's launch of the Phase III Trial in July 2014.

41. At the time it was retained by XBiotech, KCR, according to one of its own former employees ("KCR FE"),[14] was a small company based in Warsaw, Poland[15] that had ambitions of becoming a "big player" in the CRO industry. Yet even though "KCR fancied themselves as a global CRO," in reality it was merely a small Eastern European company servicing a niche market,

---

[12] *See http://www.outsourcing-pharma.com/Clinical-Development/Top-CROs-dominate-competition-in-trial-totals-review-finds*.

[13] *See id.*

[14] KCR FE worked as Director of Business Development at KCR (U.S.) from September 2012 to September 2013, and as Executive Director of Business Development from September 2013 to November 2014.

[15] According to *outsourcing-pharma.com*, KCR moved its headquarters to Berlin, Germany in or around March 2015. *See http://www.outsourcing-pharma.com/Clinical-Development/KCR-shifts-head-office-from-Warsaw-to-Berlin-to-get-closer-to-clients.*

having more often been retained by sponsors as an SMO, rather than as a CRO. In or about September 2012, when KCR FE was hired, KCR invested about $14 million to establish an office and a presence in the United States, with plans to hire eight or nine individuals there. After a few years without much success in the United States, however, KCR determined, according to KCR FE, that it would cut back on those plans, in the process laying off most of its U.S.-based staff, including KCR FE.

42. Support for KCR FE's statements regarding KCR's standing within the industry may be found in Zachary Brennan's August 18, 2014 article discussing the "top CROs." Although Brennan mentions at least 10 CROs, of varying sizes, in his article, he makes no mention of KCR.[16]

43. According to its own website, even today KCR does not consider itself to be among the elite CROs. Rather, KCR touts itself as "a reliable alternative to top tier CROs, delivering the all-important flexibility,"[17] which is consistent with the comments made by KCR's CEO regarding the "flexibility"/"security" dichotomy quoted above.

44. In light of all of the foregoing, the Company's selection of KCR as its CRO for the Phase III Trial should not surprise. KCR's status as a relatively small player in the CRO market, its background as predominantly an SMO rather than a CRO, along with the implications of that SMO background for KCR's pricing structure, and its touting of flexibility in the provision of clinical trial services were all characteristics that Defendant Simard would have found appealing. These factors combined to facilitate an arrangement between XBiotech and KCR that would limit the Company's costs while allowing Defendant Simard significant opportunities to intervene in and micromanage the study's administration. Investors were not informed of the potential

---

[16] *See http://www.outsourcing-pharma.com/Clinical-Development/Top-CROs-dominate-competition-in-trial-totals-review-finds*.

[17] *See http://www.kcrcro.com/uploads/attachments/KCR_Brochure_Gen_SCREEN_upd.pdf.*

drawbacks of this arrangement, including the risks that KCR's capabilities may be ill-suited for the Phase III Trial, that its employees did not have the requisite training and experience in the conduct of such trials, and that KCR may not have put into place adequate quality controls to ensure proper on-site execution.

45. The risk that KCR might fail to execute properly the Phase III Trial was amplified by Defendant Simard's inexperience with oversight of a global clinical trial of such size and scope, and by his ineffective and heavy-handed management style. FE1 recalls that Defendant Simard continually micromanaged KCR's administration of the study and that his efforts failed to address the emerging irregularities in the study data because he "didn't know what questions to ask" and failed to implement processes which were necessary to mitigate the problems.

***Formulating the Company's Phase III Trial Timeline***

46. Soon after launching the Phase III Trial in July 2014, KCR encountered problems in the enrollment of patients. According to FE2, certain countries in which the study was being conducted had "crazy vacation policies," which resulted in slower-than-expected enrollment during the study's early months. Another enrollment problem which KCR encountered in the study's early months was what FE2 described as an "extremely sick" patient population. An unexpectedly large number of patients who had managed to survive the initial screening evaluation and meet certain threshold criteria simply were not physically healthy enough to return to the site locations and continue with the study.

47. According to FE2, XBiotech and KCR each had a study team, and each member of those teams had access to patient data. XBiotech's study team consisted of 10-12 members, including, among others, FE1, FE2, two project managers, the Director of Biostatistics, the Director of Data Management, and at least one member of senior management, the Company's

Medical Director, Michael Stecher. FE1 confirms that Defendant Simard had ready access to the status of the enrolled patients through the Electronic Data Capture and Interactive Voice/Web Response systems. Enrollment data was available in real time, according to FE2, because such data were entered into a centralized patient database, consisting of a portal through which all study information was entered.

48. FE2 states that KCR provided oversight of the clinical sites and provided frequent updates on the progress of enrollment. The Company's study team had conference calls with KCR on a regular basis, which was "at least twice per month" and sometimes "weekly when there was lots of activity." Additionally, each week KCR presented the Company's study team with an Excel spreadsheet, known as the "Dashboard," which tracked the progress of the Phase III Trial. The Dashboard consisted of timelines and other metrics, and was updated by KCR on a weekly basis. FE1 confirms that enrollment data were delivered to the members of the Company's study team in this format on a regular basis, and that FE1 personally provided the data to Defendant Simard via email on a regular basis.

49. In addition, FE2 recalls that the Company held "enrollment meetings" on a regular basis. These meetings were attended by employees from the Clinical Operations department, including personnel from the statistics, medical monitoring, and clinical operations divisions. FE2 also recalls that the Company held "governance calls" on a regular basis, at which XBiotech's senior management, including Defendant Simard, participated.

50. Even though Defendant Simard was not formally a member of the XBiotech study team, FE1 recalls that Defendant Simard "knew [how many patients were enrolled] on a day-to-day or week-to-week basis – he received weekly spreadsheets showing the actual enrollment versus projections." FE1 explains that, during the fourth fiscal quarter of 2014 and early 2015, he

participated with Defendant Simard in weekly meetings during which the progress of the Phase III Trial was discussed. The Company's Medical Director, Michael Stecher, and Director of Biostatistics, Prasant Mohanty, also regularly attended these meetings. "All info about not hitting [enrollment] targets is known," according to FE1. "You get data every day about each clinical site, by email or phone from the CRO or electronically." Moreover, FE1 recalls that he could log onto the Electronic Data Capture and Interactive Voice/Web Response systems at any time and check the status of patient enrollment, and that Defendant Simard had the same access.

51. The problems with patient enrollment in the Phase III Trial became more concerning for the Company in late 2014 and early 2015, as XBiotech prepared for its upcoming IPO. In the Company's original Registration Statement filed with the SEC on February 2, 2015, Defendant Simard sought to include a projected timeline for the Phase III Trial in the filing that would inform investors that the study would enroll "at least 276 patients" and that the study was "expected to be completed by mid-2015."

52. FE1 considered these deadlines "absolutely unrealistic," if not virtually impossible to meet: "[T]here was no way in the world to do it without increasing the number of sites." For this conclusion FE1 relied upon the information furnished on a regular basis by KCR: "Typically the way forecasts are projected, the customer tells KCR when we'd like to finish the trial and [KCR] says, 'If you want that, you need an enrollment rate of X, [and] you need this many sites who will enroll a certain number of patients per month.'" To achieve Defendant Simard's goals, according to FE1, "would cost more" and FE1 estimated that 40-to-50-percent additional sites were needed. With the actual number of sites, FE1 said, "there was no way [the enrollment goal] could be met."

53. During weekly meetings held in Defendant Simard's office, at which the Company's Medical Director, Michael Stecher, was in attendance, FE1 and other XBiotech employees advised Defendant Simard that his enrollment goal and targeted timeframe for completion of the study were unrealistic, but "[h]e didn't like it," and "that's how you become marked [for termination], if you will." Despite these known concerns, Defendant Simard's enrollment goal and timeline for completion of the Phase III Trial were included in the Registration Statement filed with the SEC. FE1 states that he participated in meetings with Defendant Simard prior to the February 2, 2015 filing of the Registration Statement, that the low patient enrollment data were discussed, and that Defendant Simard rejected FE1's position.

**FALSE AND MISLEADING STATEMENTS**

54. On February 2, 2015, XBiotech filed a Registration Statement on Form S-1 with the SEC. The Company amended the February 2, 2015 Registration Statement several times, with the third and final amendment filed on Form S-1/A with the SEC on April 10, 2015.[18] On April 15, 2015, the SEC declared the Company's Registration Statement effective. On April 16, 2015, the Company filed its Prospectus on Form 424B4 with the SEC. In a section of the Registration Statement and Prospectus, beginning on page 10, entitled "Risks Related to our Business," the Company stated, among other things, as follows:

> We are highly dependent on our Chief Executive Officer. Our future success depends in significant part on the continued service of our Chief Executive Officer, John Simard. Mr. Simard is critical to the strategic direction and overall management of our Company as well as our research and development process. Although we have an employment agreement with Mr. Simard, it has no specific duration. The loss of Mr. Simard could adversely affect our business, financial condition and operating results.[19]

[18] Defendants Simard and Han signed the Registration Statement.
[19] Registration Statement at 21; Prospectus at 21.

55. The foregoing statements about Defendant Simard were false and misleading because they failed to disclose that Defendant Simard did not have any experience with oversight of a large, global clinical trial like the Phase III Trial. This omission precluded investors from information that is material to an assessment of the Company's prospects for a successful administration of the Phase III Trial, given the substantial influence which Defendant Simard wielded in the Company's "research and development process." FE1 states that Defendant Simard's lack of experience proved critical since, in the course of continually micromanaging KCR's administration of the study, he failed to address the emerging irregularities in the study data because he "didn't know what questions to ask" and failed to implement processes which were necessary to mitigate the problems.

56. In a section of the Registration Statement and Prospectus, beginning on page 56, entitled "Current Clinical Investigation Activity," the Company stated, among other things, the following:

> The study, which started in July 2014, will enroll at least 276 patients and is expected to be completed by mid-2015. As of March 3, 2015 about 122 patients had been enrolled. If the study endpoints are satisfactorily achieved, we expect to submit a registration package to the EMA and possible other foreign regulatory agencies.[20]

57. The foregoing statements about the patient enrollment and progress for the clinical study in the Registration Statement and Prospectus were false and misleading. Defendants knew or recklessly disregarded the wealth of daily and weekly patient enrollment data indicating that KCR had encountered problems in attaining the target numbers for patient enrollment, as well as data from KCR indicating that the Company would be unable to reach the stated enrollment target

[20] Registration Statement at 56; Prospectus at 56.

within the stated timeframe without substantially increasing the number of trial sites and the Company's costs. Defendants also knew of, or recklessly disregarded, the guidance and warnings provided by senior Company employees, such as FE1, who advised Defendant Simard during weekly meetings that attaining the stated patient enrollment target within the stated timeframe was "absolutely unrealistic," and that, with the number of trial sites then in operation, "there was no way [the enrollment goal] could be met." The "absolutely unrealistic" stated patient enrollment target, in turn, rendered the stated "mid-2015" deadline for completion of the study "absolutely unrealistic" as well.

58. In a section of the Registration Statement and Prospectus, beginning on page 10, entitled "Risks Related to Our Business," the Company stated, among other things, the following:

> [W]e rely on Clinical Research Organizations (CROs) and clinical trial sites to ensure the proper and timely conduct of our clinical trials, and while we have agreements governing their committed activities, we have limited influence over their actual performance.[21]

59. The foregoing disclosures concerning the risks relating to the Company's common stock were false and misleading because the Company did not have merely "limited influence" over KCR's "actual performance" at the trial sites. To the contrary, the Company was responsible for overseeing KCR's performance and for implementing processes to ensure that the trial were conducted in accordance with regulatory, contractual, and industry-wide standards. Moreover, Defendant Simard was likely to exercise, and in fact did exercise, material influence over KCR's performance due to his important role in the Company's research and development process and in light of his heavy-handed management style. Further, having disclosed its reliance on CROs for the conduct of its clinical trials, and the general or hypothetical risk of encountering delays in

[21] Registration Statement at 13; Prospectus at 13.

patient enrollment and completing such trials in a timely manner, Defendants were duty bound, but failed, to disclose the specific risk that its CRO may fail to execute the trials properly. Defendants knew or recklessly disregarded that: KCR was a small company which was not regarded as a "top tier" CRO and which emphasized flexibility over safety in execution; that KCR's recent efforts to build a presence in the United States had not met with success; that KCR's capabilities had been developed as an SMO, rather than a CRO; and that, as a result, KCR's employees were not qualified by training or experience to conduct a global clinical trial of the size and scope of the Phase III Trial.

60. In the same section of the Registration Statement and Prospectus, the Company also stated, among other things, the following:

> ***If we are unable to enroll subjects in clinical trials, we will be unable to complete these trials on a timely basis.***
>
> Patient enrollment, a significant factor in the timing of clinical trials, is affected by many factors including the size and nature of the patient population, the proximity of subjects to clinical sites, the eligibility criteria for the trial, the design of the clinical trial, ability to obtain and maintain patient consents, risk that enrolled subjects will drop out before completion, competing clinical trials and clinicians' and patients' perceptions as to the potential advantages of the drug being studied in relation to other available therapies, including any new drugs that may be approved for the indications we are investigating. … We may experience delays in enrolling subjects in our trials and may not be able to enroll sufficient subjects to complete the trials.[22]

61. The foregoing disclosures concerning the risks relating to the Company's common stock were false and misleading because the Company had already experienced substantial delays in achieving its patient enrollment targets in the early stages of the Phase III Trial beginning in July 2014. Such delays were impacting the projected enrollment numbers to such an extent that

[22] Registration Statement at 13; Prospectus at 13.

FE1, one of the Company's senior employees, advised Defendant Simard that attaining the stated enrollment target within the stated timeframe, without substantially increasing the number of trial sites and the Company's costs, was "absolutely unrealistic." As of the February 2, 2015 filing of the Registration Statement, Defendants knew or recklessly disregarded that the risk of experiencing delays in patient enrollment was no longer merely hypothetical. Defendants' failure to disclose known material facts regarding patient enrollment rendered the risk disclosure meaningless since investors were unaware of the hard facts necessary to appreciate the magnitude of the risks described by the Company. Defendants also knew or recklessly disregarded updated information provided to, or available to, them on a daily or weekly basis regarding the status of each patient enrolled in the study, and failed to disclose the material number of irregularities that had already occurred during KCR's administration of the Phase III Trial since its July 2014 launch.

62. On May 27, 2015, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended March 31, 2015 (the "March 31 Form 10-Q").[23] The March 31 Form 10-Q incorporates by reference the risk disclosures made in the Company's Registration Statement and Prospectus.[24]

63. The foregoing disclosures concerning the risks relating to the Company's common stock were false and misleading for the same reasons as stated in paragraphs 54-61 above.

64. On August 14, 2015, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended June 30, 2015 (the "June 30 Form 10-Q").[25] The June 30 Form 10-Q

[23] Defendants Simard and Han signed the March 31 Form 10-Q.
[24] March 31 Form 10-Q at 5, 24.
[25] Defendants Simard and Han signed the June 30 Form 10-Q.

incorporates by reference the risk disclosures made in the Company's Registration Statement and Prospectus.[26]

65. The foregoing disclosures concerning the risks relating to the Company's common stock were false and misleading for the same reasons as stated in paragraphs 54-61 above.

66. On November 13, 2015, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended September 30, 2015 (the "September 30 Form 10-Q").[27] The September 30 Form 10-Q incorporates by reference the risk disclosures made in the Company's Registration Statement and Prospectus.[28]

67. The foregoing disclosures concerning the risks relating to the Company's common stock were false and misleading for the same reasons as stated in paragraphs 54-61 above.

**THE TRUTH EMERGES**

68. On the morning of July 28, 2015, the Company issued a press release and held an earnings conference call in which the Company and Defendant Simard revealed only the falsity of the Company's statements in the Registration Statement and Prospectus regarding the rate of patient enrollment and timing for completion of the study. Defendant Simard stated that the Phase III Trial "is expected to be completed towards the end of this year," and that "enrollment is a little less than what we would like to be at this juncture." Defendant Simard continued by disclosing that "[w]e now may see enrollment carry on into September, but our timeline to have a readout by year end should not be affected." The July 28, 2015 press release and earnings conference call did not reveal the falsity of any other prior statements made by the Company.

---

[26] June 30 Form 10-Q at 15, 23.
[27] Defendants Simard and Han signed the September 30 Form 10-Q.
[28] September 30 Form 10-Q at 15, 23.

69. As a result of this adverse news, XBiotech's share price declined approximately 7.5% over several trading days as the market digested and incorporated the Company's July 28, 2015 corrective statements regarding patient enrollment and the completion of the study into the price of XBiotech stock.

70. The Company's stock price opened on the morning of July 28, 2015 at $20.00, and fell to $19.80 or 1.0% by the close of that day. On July 29, 2015, the Company's stock price fell $0.75/share to $19.05 or 3.8% by the close of the market. Then on July 30, 2015, XBiotech shares fell another $0.54/share or 2.6% to close at $18.51 that day. These drops in the price of the Company's shares did not track the movement of comparable indices for the broader markets, which increased on those trading days. For example, the Russell 2000 opened on the morning of July 28, 2015 at $1,219.47 and increased to $1,224.60 (a 0.4% increase) by the close of the market on that same date. On July 29 and 30, 2015, the Russell 2000 increased to $1,229.60 and then to $1,232.07, respectively. Thus, absent the upwards movement of the market's generally, XBiotech's share price would have declined even further as a result of the partial corrective disclosure.

71. After market closed on November 23, 2015, the Company issued a press release entitled "XBiotech Provides Update on Phase III Oncology Study in Europe," which revealed for the first time that "25 patients dropped off study prior to receiving any dosing with drug or placebo," "14 patients erroneously received either placebo or study drug," and "33 patients completed the study but failed to receive scheduled DEXA scans, properly complete EORTC evaluation, or both." According to the press release, "these combined irregularities compromises data from 72 patients in the study," and "oversampling was not performed to accommodate [such]

data loss." Consequently, the study will have reduced statistical power to demonstrate the proposed effect."

72. This adverse news caused XBiotech stock price to decline $4.50 per share, or approximately 34%, to close at $8.75 per share on November 24, 2015, on unusually heavy volume.

73. In a report issued on November 24, 2015, an analyst for Noble Financial advised investors that the "mismanagement" of the Phase III Trial was "likely due to poor execution by CRO."

74. The data loss and other clinical trial problems revealed in the November 23, 2015 corrective disclosure resulted from Defendants' reckless attempt to enroll patients in accordance with the impossible timeline set forth in the Registration Statement and Prospectus, which Defendants knew at the time was impossible. There was not sufficient sampling, which resulted in lost data. In addition, the failure of Defendants to execute properly the Phase III Trial was a direct result of Defendant Simard's undisclosed inexperience with oversight of a global clinical trial of such size and scope, and by his reckless management of the clinical trial.

## CLASS ACTION ALLEGATIONS

75. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased XBiotech common stock traded on the NASDAQ Stock Market (the "NASDAQ") during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

76. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, XBiotech securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. XBiotech or its transfer agent maintains a list of record owners, enabling it to identify other members of the Class and to issue notice of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

77. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

78. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

79. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of XBiotech;

(c) whether the Individual Defendants caused XBiotech to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of XBiotech securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

80. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ADDITIONAL SCIENTER ALLEGATIONS**

81. In their IPO, Defendants offered 4 million shares of common stock for sale at the offering price of $19.00 per share. On April 17, 2015, according to the March 31 Form 10-Q, Defendants "closed the sale of such shares, resulting in net proceeds to us of approximately $70.9 million after deducting underwriting discounts and commissions of $3.8 million and other offering expenses of approximately $1.3 million."[29]

82. In their Prospectus, Defendants stated that they expected to use "approximately $30 million" from the net proceeds of the IPO "to complete our Phase III trials for Xilonix in the United States and Europe."[30]

[29] March 31 Form 10-Q at 24.
[30] Prospectus at 33.

**APPLICATION OF PRESUMPTION OF**
**RELIANCE: FRAUD ON THE MARKET**

83. Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for XBiotech common stock was efficient for the following reasons, among others:

(a) For most of the Class Period, XBiotech's shares of common stock traded on the NASDAQ;

(b) As a regulated issuer, XBiotech filed periodic public reports with the SEC;

(c) XBiotech regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(d) During the Class Period, the average daily trading volume in XBiotech's shares was 132,707.87 shares or weekly average trading volume of approximately 645,160.88 shares. As of March 31, 2015, the company had 31,716,631 shares of common stock issued and outstanding of which insiders owned 10,330,000 shares. With a public float of approximately 14.81 million shares, on average, 0.896 % of the float traded daily and approximately 4.36 % of the float trading weekly, establishing a strong presumption that the market for its stock was;

(e) New company specific information was rapidly reflected in the Company's stock price; and

(f) During the Class Period, as many as sixty-three (63) market makers made a market in the Company's stock.

84. As a result of the foregoing, the market for XBiotech's common stock promptly digested current information regarding XBiotech from all publicly available sources and reflected

such information in XBiotech's stock price. Under these circumstances, all purchasers of XBiotech's common stock during the Class Period suffered similar injury through their purchase of XBiotech's common stock at artificially inflated prices, and a presumption of reliance applies. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market

85. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**NO SAFE HARBOR**

86. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of XBiotech who knew that the statement was false when made.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

87. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88. This Count is asserted against XBiotech and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

89. During the Class Period, XBiotech and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of XBiotech securities during the Class Period.

91. XBiotech and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of XBiotech were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

securities laws. These defendants by virtue of their receipt of information reflecting the true facts of XBiotech, their control over, and/or receipt and/or modification of XBiotech's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning XBiotech, participated in the fraudulent scheme alleged herein.

92. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other XBiotech personnel to members of the investing public, including Plaintiff and the Class.

93. As a result of the foregoing, the market price of XBiotech securities was artificially inflated during the Class Period. In ignorance of the falsity of XBiotech's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of XBiotech securities during the Class Period in purchasing XBiotech securities at prices that were artificially inflated as a result of XBiotech's and the Individual Defendants' false and misleading statements.

94. Had Plaintiff and the other members of the Class been aware that the market price of XBiotech securities had been artificially and falsely inflated by XBiotech's and the Individual Defendants' misleading statements and by the material adverse information which XBiotech's and the Individual Defendants did not disclose, they would not have purchased XBiotech securities at the artificially inflated prices that they did, or at all.

95. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

96. By reason of the foregoing, XBiotech and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of XBiotech securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

97. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

98. During the Class Period, the Individual Defendants participated in the operation and management of XBiotech, and conducted and participated, directly and indirectly, in the conduct of XBiotech's business affairs. Because of their senior positions, they knew the adverse non-public information about XBiotech's false and misleading financial statements.

99. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to XBiotech's financial condition and results of operations, and to correct promptly any public statements issued by XBiotech which had become materially false or misleading.

100. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which XBiotech disseminated in the marketplace during the Class Period concerning XBiotech's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause XBiotech to engage in the wrongful acts complained

of herein. The Individual Defendants therefore, were "controlling persons" of XBiotech within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of XBiotech securities.

101. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by XBiotech.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Date: 4/8/2016

Respectfully submitted,

*/s/ Randall O. Sorrels*

Randall O. Sorrels
Attorney-in-Charge
Texas Bar Number: 18855350
Federal ID No.: 11115
800 Commerce Street
Houston, Texas 77002
(713) 222-7211 (telephone)
(713) 225-0827 (telecopier)
rsorrels@abrahamwatkins.com
ATTORNEY FOR CLAIMANT

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein (*pro hac vice* forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Peretz Bronstein, certify that on the 8th day of April 2016, a copy of the forthcoming document was served on all parties via CM/ECF notification system.

*Peretz Bronstein*___________
Peretz Bronstein